OVERTON, J.
 

 On August 22, 1924, John Dart entered into an agreement to purchase from Charles M. Prue lots 82, 84, 86, 88, 90, and 92 of block B on Audubon boulevard in the city of New Orleans, for the sum of $27,-000 cash, which Dart agreed to pay if Prue would give him a good and valid title, free of incumbrances. Dart in accordance with the agreement to purchase, deposited 10 per cent, of the purchase price with Prue’s agent. He examined the title to the property, and found what he considered a defect in lots 90 and 92, and notified Prue that he would be ready to complete the transaction within the time specified in the contract, provided' the defect which he considered existed in the title to lots 90 and 92 would be removed.
 

 The defect which Dart fears and contends exists in the title to lots 90 and 92 is that Prue ownes only an undivided half interest in said lots, the remaining one-half undivided interest therein being owned, it is contended, by the minors Albert Bel Pay and Ernest Bel Pay, issue of the marriage of Charles S. Pay and Marie Bel, now deceased. Prue, being satisfied with the title tendered by him to Dart, filed a motion for a rule in the succession of Marie Bel Pay, praying that Dart be ordered to show cause why he should not accept title to the six lots which -he agreed to purchase. Tlie minors Albert Bel Pay and Ernest Bel Pay, through their father and natural tutor, Charles S. Pay, and through their undertutor, Joseph Lallande, were made parties to the rule.
 

 Dart appeared and filed an exception to the rule, which, though it is termed an exception to the jurisdiction of the trial court ratione materise, is, in reality, only an exception to the method and form of procedure adopted by Prue. In this exception, Dart expresses his willingness to waive the objections to the procedure set forth in it, provided a valid judgment may be rendered on the merits. In our opinion, such a judgment may be rendered, the defects of procedure, if any, not being jurisdictional. Hence, in view of the waiver, it is unnecessary to consider the exception further.
 

 At the same time that Dart filed his exception, he filed an answer, in which he sets forth his agreement to purchase, and in which he avers that he is anxious to purchase, if Prue is in position to convey to him go.od title to the property, but that Prue is
 
 *1025
 
 unable to transfer such’ title, for the reason that he is the owner of only an undivided half interest in lots 90 and 92, the minors Albert Bel Fay and Ernest Bel Fay, being the owners of the remaining undivided half interest in the same, they having acquired that interest by inheritance from their mother, Marie Bel Fay. Dart then avers that he incurred certain expenses relative to the property amounting to $111.60, and that, in addition thereto, he deposited with Frue’s agent, in accordance with the terms of his contract to purchase, one-tenth of the purchase price, or $2,700. He then avers that he is entitled to judgment in reconvention rescinding the contract, and to further judgment; therein for said expenses incurred and said deposit made, and prays accordingly.
 

 The tutor of the minors, Albert Bel Fay ' and Ernest Bel Fay, filed no answer, possibly because his interests in the subject-matter of this litigation are in conflict with the interests of his wards, but the undertutor of said minors did file an answer. His answer is brief, and is as follows:
 

 “That he is informed and believes that the property referred to in said rule Was not acquired by Charles S. Fay during the community which existed between Charles S. Fay and Mrs. Marie Bel Fay, mother of the minors, but that it was acquired prior to the community, and though the last payment on account of the purchase price was made a few days after the marriage of Charles S. Fay to Mrs. Marie Bel Fay, the money used to make said payment was the separate property of said Charles S. Fay.
 

 “Wherefore, defendant submits the matter to the court for adjudication.” ,
 

 The two lots, the title to which is objected to, were once owned by the Southern Land Company. Charles S. Fay desired to purchase the lots, and he, on May 18, 1909, during the regime of the community that existed between him and his first wife, Maude Lob-dell, entered into a contract with the Southern Land Company to purchase them for $3,-400. Of this sum $400 was paid cash, and the balance was represented by promissory notes, executed by Fay, each for $1,000, one maturing May 18, 1910, one May 18, 1911, and the last one May 18, 1912.
 

 Since the judgment to be rendered in this case, in our view, depends largely, if not entirely, upon the effect to be given the contract to purchase, entered into by Fay with the Southern Land Company, we should quote those parts of the contract which are pertinent to the issue in this case, or rather, since the contract involved herein has been lost, from what Frue has proven to be, save as to the consideration, the name of the one agreeing to purchase, and the description of the property, a fac simile of that contract. •The contract, as proven, in its pertinent parts, is as follows:
 

 “The party of the first part (the Southern Land Company) hereby agrees to sell, and the party of the second part (Charles S. F'ay) hereby agrees to buy these two certain lots or parcels of land lying, situated and being in the city of New Orleans, state of Louisiana, being more particularly described as lots 90 and 92, block B, Audubon boulevard, on the map of the Southern Land Company’s lands, the same in size and location to be in accordance with said map or plan of lot on file in the city engineer’s office of said city of New Orleans.
 

 “The party of the second part agrees to purchase, and does purchase, the above-mentioned property for the sum .of $3,400, on the following-terms and conditions, to wit:
 

 “The sum of $400 paid this day; $1,000 payable on May 18, 1910; $1,000 on May 18, 1911; $1,000 on May 18, 1912^ at their office or any bank in New Orleans, La., together with interest at the rate of 6 per cent, per annum from May 18, 1909.
 

 “The party of the second part in consideration of the purchase price above specified, has given his promissory notes of even date for the remainder of the purchase price, which notes are hereby identified with this agreement. * * *
 

 “In consideration of the covenants and agreements herein above made by the party of the second part, the party of the first part agrees, when all payments have beep made in accordance with the terms and conditions of this agreement, to deliver to the party of the second part a good and sufficient warranty deed to the premises herein described.”
 

 
 *1027
 
 Following the foregoing provisions is a paragraph to the effect that, should the party of the second part default in any of the payments above mentioned, the entire amount remaining unpaid shall at once become due and payable, and the party of the first part, at its option, may either sue to recover said balance, or return the unpaid notes, and retain, as liquidated damages, all amounts paid. Then follow provisions recognizing the existence of, and establishing, subject to the contract, certain servitudes, and granting and conveying rights appertaining to, them “to the purchaser (referring to the party of the second part) or his heirs and assigns.” The rest of the contract relates to building restrictions and the like. The agreement ends with a declaration that time is of its essence.
 

 Less than a year after this contract was entered into, the first Mrs. Fay died. After her death, Fay met the payments on the property as they matured. On April 10, 1912, he married Marie Bel. During the existence of this marriage, and a little over a month after it was contracted, to wit, on May 18, 1912, the last note, given under the contract to purchase, fell due, and was paid by Fay. The payment was not made with funds belonging to the second community. On May 20, 1912, two days following the last payment made, the Southern Land Company, by notarial act, deeded the property to Fay, with full warranty of title, for the recited consideration of $3,400 cash. There is no declaration in the deed to the effect that Fay purchased the property with his separate funds and that the title should vest in his separate estate, nor any declaration that might be construed as excluding the property from the second community. A little over two years after the execution of this deed, the second Mrs. Fay died, leaving her husband and the two minors, Albert Bel Fay and Ernest Bel Fay. About two years later, Fay, looking upon the property as having belonged to the first community, purchased what he conceived to have been his first wife’s one-half interest therein from the children of his first marriage, who he considered had inherited that half from their mother. The effect of this purchase, in his view, was to make hini owner of these lots in their entirety. Fay, after making the foregoing purchase, sold the lots. Frue claims title from Fay by a regular chain of conveyances.
 

 From the foregoing it is obvious that the two lots in question, when acquired by Fay, fell either into the first or second community,, or else became his separate property. There is no contention that, when Fay acquired the property, the title to it vested in his separate estate. In fact, there is no room for such a contention, since there is no declaration in the deed to the effect that Fay, in acquiring the property, purchased it with his separate funds, and that the title to it should vest in his separate estate. A declaration to that effect in the deed by which the property is acquired, when the husband purchases, is necessary, in order to make the title vest in his separate estate; the mere fact that he has so purchased being alone insufficient to make the title so vest. Succession of Goll, 156 La. 910, 101 So. 263. Moreover, Fay could not have made such a declaration, and, had he done so, it would have been ineffective, for it cannot be contended, in the face of the evidence herein, that he purchased the property, at least entirely, with his separate funds. Hence, the question is presented whether the property, when acquired by Fay, vested in the first or second community. If it vested in the first community, then there is no reason, and admittedly so, why Dart should not accept-title. If, upon the other hand, it vested in the second community, then there is ample reason why Dart should not be required to accept title,
 
 *1029
 
 for then Frue would have no valid title to the whole to convey.
 

 It is obvious that until Fay acquired, the property it fell into neither community, but remained the property of the Southern Land Company. -We must look, therefore, to the time at which Fay acquired the property. Civil Code, art. 2402, as amended by Act 68 of 1902. If he acquired it at the time the agreement to purchase was entered into, then it fell into the first community, for that community was then in existence. If, however, he did not acquire it until the deed was executed by the Southern Land Company to him, on May 20, 1920, then, we think, the land fell into the second community, which was then in existence. It cannot be said, if the property was not acquired by Fay until May 20, 1912, that the title related back to the first community, for the doctrine of relation has no application here. It is the time when the property was acquired that must be looked to in determining its status.
 

 To determine when the property, in this instance, was acquired by Fay, it is necessary to decide what effect should be given to the instrument of May 18, 1909, which we have termed “a contract to purchase,” or, in other words, it is necessary to determine whether that instrument transferred the title to the property from the Southern Land Company to Fay.
 

 Taking that question up for consideration, it may be observed that it was said in Trichel v. Home Ins. Co., 155 La. 459, 99 So. 403, quoting from the syllabus (which is in accord with the text of the decision) that:
 

 “In ease of sale of real estate, neither consent nor delivery nor payment of price is sufficient to transfer the ownership; but there must be a deed translative of the title.”
 

 In the same case it was held that:
 

 “Any agreement for the sale of real estate, which is not intended to be the final writing between the parties, but, on the contrary, to be followed by another and final deed, is a mere promise of sale and not a sale,
 
 and does not transfer the title to said property;
 
 unless it clearly appear that the parties contemplated-that the new deed should be only a confirmation of the first, and not indispensable for the transfer of title.” (Italics ours.)
 

 Applying the foregoing principles to the contract under consideration, our conclusion is that the contract is a. mere promise of sale, or, which is the same, a mere contract to purchase. It is merely an agreement by which one party agrees to^sell and the other to buy, the deed transferring title to be delivered upon the payment of certain installments. It is true that in one place in the contract it is stipulated that Fay “agrees to purchase and does purchase,” and that in one or two places the Southern Land Company is referred to as the vendor and Fay as the purchaser; but these expressions are not controlling, for the instrument, as a whole, shows that it is merely a promise of sale. Moreover, that it is only such is made clear by the provision relative to the delivery of a deed upon the payment of the installments. There could have been no other reason, in this instance, to withhold the deed, than not to convey title until the payment of the installments, and no other reason to execute and deliver the deed, after the payment of the installments, than to convey title. See, in this connection, Capo v. Bugdahl, 117 La. 992, 42 So. 478; Campbell v. Ins. Co., 156 La. 455, 100 So. 679.
 

 Since the contract under consideration was a mere promise of sale, it follows under the authorities cited that it did not have the effect of transferring title. Therefore, as the first Mrs. Fay died before title was transferred, title to the property did not vest in the first community, but remained in the Southern Land Company until the execution of the deed conveying the property. As the second community was in existence at the time the deed was executed and delivered to Fay, the property fell into that community, with the
 
 *1031
 
 obligation upon it to reimburse Fay the money paid by him out of his separate estate, if any, on account of the purchase price of the property.
 

 Since the property fell into the second community, it follows that Fay’s children by his first marriage acquired no interest in it, upon the death of their mother, and for the
 
 same reason
 
 it follows that his( children by his second marriage, upon the death of their mother, acquired an undivided half interest in the prdperty. That interest has never been divested. Hence the title to these lots is not such as Dart is called upon to accept, and since they are a part of the property, which Dart offered to buy, and Frue agreed to sell him, as a whole, he cannot be required to accept the remainder of the property.
 

 Before
 
 passing to
 
 the next
 
 phase
 
 of
 
 the case, we may say that Frue, in his brief, takes the position that the foregoing objections urged by Dart to the title to the two lots in question are disposed of by the disclaimer in the answer filed by the undertutor. We have quoted the answer above. We do not view it as a disclaimer, assuming that the undertutor could enter one, for although, as appears from the answer, the undertutor is of the opinion that the minors whom he represents have no interest in the property, yet he submits the matter to the court for determination after alleging what he believes to be the facts.
 

 Since Dart cannot be required to accept the title tendered, he is entitled to have the contract entered into with Frue rescinded and to have returned to him the .$2,700 deposited by him under the contract. He is also entitled to judgment against Frue for the expenses incurred by him in connection with the property. These expenses amount to $111.60, and consist of the outlay for surveying it, for filling portions of it, and of several small items such as conveyance and mortgage certificates, and the cost of obtaining tax certificates.
 

 For the reasons assigned, the judgment appealed from is annulled and set aside, and it is now ordered that the rule filed by said Frue be dismissed, and that said Dart have and recover judgment against said Frue in reconvention, rescinding said contract, and for said sum of $2,700, with 5 per cent, per annum interest thereon from November 5, 1924, and for said sum of $111.60, with 5 per cent, per annhm interest thereon from December 16, 1924; and it is further ordered that said Frue pay the costs of this and of the lower court.
 

 O’NIELL, O. J., dissents.